**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

CANDICE ZYBURO AND CATHERINE
ZYBURO,

               Plaintiffs,

      v.

NORTH AMERICAN COMPANY FOR
LIFE AND HEALTH INSURANCE,

              Defendant.

CASE NO. 1:23-cv-01083-JHR-SCY

**FIRST AMENDED COMPLAINT FOR FOR BREACH OF LOYALTY, BREACH OF DUTY OF DISCLOSURE, NEGLIGENT MISREPRESENTATION, FRAUDULENT MISREPRESENTATION, UNJUST ENRICHMENT, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, VIOLATION OF THE NEW MEXICO INSURANCE CODE, AND VIOLATION OF THE UNFAIR TRADE PRACTICES ACT**

**COME NOW** Plaintiffs, Candice Zyburo and Catherine Zyburo, by and through their attorneys of record, DeNiro Law, LLC (May Dozier-Reed, Esq., and Vanessa L. DeNiro, Esq.), and hereby files this First Amended Complaint against the Defendant, North American Company For Life and Health Insurance, seeking relief for Breach Of Loyalty, Breach of Duty of Disclosure, Negligent Misrepresentation, Fraudulent Misrepresentation, Unjust Enrichment, Breach Of Contract, Breach of Implied Covenant of Good Faith And Fair Dealing, Violation of the New Mexico Insurance Code, and Violation of The Unfair Trade Practices Act

### A.  PARTIES, JURISDICTION AND VENUE

1.      Plaintiff, Candice Zyburo, is an individual residing in Nassau County in the State of New York. Candice Zyburo is also the Personal Representative of the Estate of Charles Dennis Zyburo and a survivor beneficiary of the Fixed Index Annuity.

1

2.      Plaintiff, Catherine Zyburo, is an individual residing in Bernalillo County, New Mexico. Catherine Zyburo is also a beneficiary and owner of the Fixed Index Annuity issued effective October 18, 2016.

3.      Defendant, North American Company for Life and Health Insurance is a corporation existing under the laws of the state of Iowa with its principal place of business in West Des Moines, Iowa.

4.      The insured party who passed away, Charles Dennis Zyburo (hereafter "Decedent") died on February 18, 2021. At the time of death, Decedent was domiciled in Bernalillo County, New Mexico.

5.      On December 6, 2023, the Defendant removed this case from the Second Judicial District Court.

6.      On January 24, 2024, Defendant filed its Motion to Dismiss.

7.      This First Amended Complaint is filed timely pursuant to FRCP 15(a)(1)(B) and the February 12, 2024 Order granting extension for Plaintiffs to file their First Amended Complaint.

8.      Jurisdiction and venue are proper in this Court.

## B.  FACTUAL BACKGROUND

9.      On or about September 13, 2016, Decedent (67**),** and Plaintiff Catherine (Catherine") Zyburo (68), met with Defendant's Agent, Robert Shigley, who encouraged them to replace 100% of their existing annuity with MassMutual Financial Group to Defendant North American Company ("NAC"). **Exhibit A,** *Authorization to Transfer Funds.* At the time of issuance, Catherine Zyburo (hereafter "Catherine") and the Decedent were married.

10.     Catherine and the Decedent executed a Full Surrender Request of their annuity with MassMutual and on October 10, 2016, the contract was surrendered. The surrender charge cost them $14,074.56. **Exhibit B**, *MassMutual 1035 Exchange and Surrender.*

11.     On or about October 18, 2016, Defendant issued a Fixed Index Annuity (hereafter "Annuity") to Catherine Zyburo and the Decedent, as joint owners. The Annuity issued is governed by an Individual Single Premium Deferred Annuity Contract ("Annuity Contract" or "Contract"). See **Exhibit C**, *Annuity Contract*

12.     After issuance of the Annuity, the survivor beneficiary designations were as follows: 100% to the surviving spouse as the primary beneficiary and as contingent, 25% each to Gregory Zyburo, Rosemarie Zyburo, Renee Zyburo, and Candice Zyburo.

13.     The Premium deposited at the time of purchase was $600,742.06.  The Decedent issued a check for $112,778.00 to Defendant on September 8, 2016, and Catherine issued a check to Defendant for $30,708.00 on September 19, 2016. On October 11, 2016, MassMutual tendered a check for $457,256.06 to Defendant through the 1035 Exchange. **Exhibit D,** *Premium Payment.*

14.     As part of this Annuity Contract, Catherine and the Decedent were also encouraged to purchase a Death Benefit Rider because of the guarantees and benefits that it offered to their beneficiaries. The prior annuity contract with MassMutual did not include a Rider.

15.     The Benefits Rider Charge was 1.2%. The Benefits Rider Cost equaled the Benefit Base as of that Contract Anniversary multiplied by the Benefits Rider Charge that applies on that Contract Anniversary.

16.     As of the date of the Decedent's death, the Death Benefit Rider's Benefit Base was valued at approximately $833,940.80.

17.     On or about October 18, 2016, the Defendant's agent, Robert Shigley prepared a "Basic Account Information & Reasons for Replacement" report. In his Summary, he reported that the Client Goals included the opportunity to "[i]ncrease their death benefit [and] increase their guaranteed income." Under Death Benefit Needs, Shigley reported that "Clients would like to leave funds to their kids if they do not use them in their lifetimes. The new contract Death Benefit far exceeds the replacement contract - see above." **Exhibit E**, *Shigley Summary.*

18.     In the same report, above, Shigley's Summary is the "Basic Account Information & Reasons for Replacement" where he compared the new NAC Annuity Contract with the Replaced Mass Mutual annuity contract. *Id.* at page 2.  Under the Death Benefit section, Shigley reported that the difference was a $249,791.00 increase with the NAC Annuity Contract that "Guaranteed" a $720,000.00 value of the Death Benefit at the end of year one (1). *Id.* He continued guaranteeing a value of $840,000.00 of the Death Benefit at year five (5) and $960,00.00 at year ten (10). *Id.*

19.     Catherine and the Decedent were convinced that the replacement of their MassMutual annuity with the NAC Annuity was in their best interest and relied on the Defendants' expressed guarantees.

20.     On October 19, 2016, the President of NAC, sent a copy of the Contract to the Decedent, with a cover letter stating that the Rider Death Benefit provides "a Benefit Base over 5 years", no qualifiers or conditions were stated. See **Exhibit F,** *October 19, 2016, NAC Letter.*

21.     According to the Annuity Contract, the death benefit offers the beneficiary a choice to receive an accumulation Value, or the Benefit Base paid out over five equal annual payments when the rider is in effect and is not in the first contract year.

22.     Under the Annuity Contract, distribution of the "Rider Death Benefit" to beneficiaries is as follows:

> **Rider Death Benefit:**
> **Option 1:** Benefit Base as of the date of death paid out in a series of equal periodic payments over 5 years at an interest rate of 0% with the first payment made upon notification of death; or
> **Option 2:** Payable as a lump sum: Premium on the Benefits Rider Issue Date, provided no partial surrenders (other than for Benefits Rider Costs) have been taken since the Benefits Rider Issue Date.
>
> **Rider Death Benefit Waiting Period:**
> 1. 1 Contract Year after the Benefits Rider Issue Date for Rider Death Benefit Option 1 as listed above.
> 2. No waiting period applies for Rider Death Benefit Option 2 as listed above.[1]

See **<u>Exhibit C</u>**, *Annuity Contract* at 15.

23.     Nowhere in the Contract does it state that the Rider Death Benefit must be distributed within the first year of the Owner's death. Nor does it state anywhere in the Contract that the Rider Death Benefit would terminate if the distribution does not commence within the first year of the Decedent's death. *See generally* **Ex. C**, *Annuity Contract.*

24.     The Annuity Contract also states "[u]nder the terms of this Rider, Your Beneficiary has the option to elect either: **1) The Death Benefit** offered under the Contract to which this Rider is attached; or **2) The Rider Death Benefit** as defined on the Benefits Rider Specifications Page." *Id.* at 33.

---

[1] This section also states "We will interpret the provisions of this Benefits Rider so that Your Contract, as endorsed by this Rider, is intended to comply with Section 72(s) of the Internal Revenue Code, or as later amended, as applicable." *Id.* at 15.

25.     The Contract states that distribution of the **Death Benefits** (not the Rider Death Benefit) will:

> 1) Be distributed to the applicable Owner's Beneficiary within 5 years from the death of the Owner, or
>
> 2) If requested by the Owner's Beneficiary, be distributed over a period not extending beyond the life expectancy of the Owner's Beneficiary, provided such distributions begin no later than one year after the date of death of the Owner or a later date as prescribed by Internal Revenue Service regulations.

*Id.* at 24. Only under the Death Benefits option, not the Rider Death Benefits option does it require that distribution begin one year after the Owner's death if the Beneficiary chooses a payment not beyond her life expectancy, which could be over five years.

26.     On November 16, 2016, Defendant's President, Cindy Reed, sent a letter to the Decedent stating the "Benefits Rider includes a Benefit Base which is the  basis for . . . a Rider Death Benefit... ." She continued by stating "The Benefit Base is available to your beneficiaries upon death when the Benefit Base is paid over 5 equal annual payments and your beneficiaries elect this Death Benefit option." See **Exhibit G**, *November 17, 2016 Letter to Decedent.*  Ms. Reed never advised the distribution of the Benefit Base under the Rider within one year of the Decedent's death.

27.     On or about October 18, 2017, Decedent received the first Annuity Statement. In the first year, the annuity earned $56.397.18 in interest and index credits. Their Benefit Rider cost was $ 9,462.81 and deducted from the ending accumulation value totaling $647,676.43 at the end of year one. The Death Benefit Amount was listed as $788,567.67. See **Exhibit H**, *2017 Annuity Year 1 Statement.*

28.     On August 16, 2018, Defendant purportedly sent letters to Catherine and the Decedent, advising that it was notified of an impending divorce. See **Underline: Exhibit I**,[2] *August 16, 2018, NAC Letter to Catherine re Divorce.* Neither received the letter nor had divorce proceedings commenced. The letter stated it was restricting their account if they did not sign the alleged Divorce Settlement Form attached to the letter. *Id.*

29.     It would not be completed for another year and therefore the Divorce Settlement Form could not be executed. The letter was also returned to sender.

30.     On August 27, 2018, Catherine Zyburo filed a Verified Petition for Dissolution of Marriage in the Second Judicial District Court, under Case Number D-202-DM-2018-02685.

31.     On June 3, 2019, in the middle of the 2019 Contract year, Defendant sent Catherine a Letter stating that as of 5/21/2019, her Accumulation Value is $658,155.67. See **Exhibit J**, *June 3, 2019, NAC Letter to Catherine re Accumulation Value*.

32.     On July 19, 2019, Catherine and the Decedent were officially divorced. The Stipulated Final Decree of Dissolution of Marriage ordered that the Marital Settlement Agreement ("MSA") was incorporated into, and made a non-separable part of the Final Decree. Pursuant to Article III(1)(E) and (2)(E) of the MSA, the Annuity was to be divided equally. See **Exhibit K,** *Marital Settlement Agreement.*

33.     After the divorce was finalized, Catherine informed the Defendant of the final decree and division of the Annuity as well as her one-half ownership interest in the Account. See **Exhibit L**, *Affidavit of Catherine Zyburo.*

34.      Although, on August 8, 2019, Catherine submitted a request for address and phone number change to Defendant, on September 10, 2018, Defendant sent a letter to the agent,

---

[2] This document was produced by Defendant in response to the subpoena issued against them in Probate court.

Robert Shigley advising of returned mail sent to Catherine. See **Exhibit M**, *September 10, 2018 Defendant's Letter to Shigley.*

35.     On November 4, 2019, Defendant sent two separate letters to Catherine and the Decedent, addressed to them individually, proving that Defendant had actual knowledge of their divorce and the 50-50 split of the Annuity Account. Enclosed in the Letter, was the Guaranteed Benefits Statement for the 2019 Benefit Statement Date. The Statement disclosed the values for the Annuity's Benefit Base and Rider Death Benefit including the amounts for 5 equal annual payments of benefits if elected. It also stated that the Benefit Base cannot be withdrawn as a lump sum. Nowhere in the Statement did it state that distribution of the Rider Base Benefits must begin within one year of the owner's death. See **Exhibit N**, *November 4, 2019, NAC Letters to Catherine & Decedent.*

36.     Defendant never sent Catherine or Decedent any notice of insufficiency regarding the division of the Annuity Account.

37.     On January 27, 2020, the Decedent executed his Last Will and Testament. The Decedent's Will provided for a specific gift, stating, "An annuity from North American Company policy number 8000299481 **my portion all goes to Candice Melanie Zyburo**." (*emphasis added*). See **Exhibit O,** *Decedent's Last Will and Testament.*

38.     On or about February 3, 2020, the Decedent faxed an Annuity Beneficiary Change Request to the Defendant, designating his daughter, Plaintiff Candice Zyburo ("Candice"), as the sole primary beneficiary of his Annuity Death Benefits. See **Exhibit P,** *Annuity Beneficiary Change Request.*

39.     The Decedent filled out the Request form pursuant to the Defendant's form requirements. *Id.* at 1. The Defendant never alerted the Decedent to any problems or concerns it may have had with his Beneficiary Change Request.

40.     The Decedent's intent to change his beneficiary to Candice, whereas she would receive his one-half share of the Annuity death benefit, is clear and unequivocal pursuant to the Divorce Decree and MSA, Decedent's Will, and Annuity Beneficiary Change Request.

41.     Likewise, the fact that Catherine was entitled to her one-half interest in the Annuity death benefit upon the Decedent's death, was also evident pursuant to the Divorce Decree and MSA, and the fact that Catherine informed the Defendant of the divorce and her one-half ownership interest in the Annuity.

42.     On September 29, 2020, Catherine submitted another Address/Phone Change to Defendant and on October 14, 2020, the Decedent submitted an Address/Phone Change to Defendant. See **Exhibit Q**, *NAC's Address/Phone Change Receipts.* Communication to the Defendant was never lacking by Catherine or the Decedent.

43.     The Decedent passed away on February 18, 2021.

44.     Immediately after the death, Candice engaged Robert Shigley for assistance to notify Defendant of the death and to help her file a claim for the Death benefits. A claim was opened shortly after and notification of death was provided to Defendant. The Defendant never responded.

45.     On or about March 23, 2021, Shigley contacted the Defendant's claims department by phone, on behalf of Candice, and verbally advised of Decedent's death. According to the call notes provided by Defendant, Shigley also informed Defendant of the Divorce. See **Exhibit R**, *March 23, 2021, Defendant's Call Notes with Shigley Claim obo Candice Zyburo.*

46.    During that call, Carla DeNeui-Simonsen of the Defendant's claims department, advised Shigley that "we will need a decree with property settlement to review prior to sending out claim paperwork." She noted that Candice Zyburo is the Executor." *Id.*

47.    Catherine also contacted the Defendant to make a claim for the death benefits on the Contract Annuity. Ex. The Defendant replied on March 30, 2021, directing Catherine to provide the Death Certificate and to return the Claimant Statement by Beneficiary form. See **Exhibit S**, *March 30, 2021, NAC Letter to Catherine re Claim.* That letter also included

> This contract has a Death Benefit Rider that will pay the Benefit Base as of the date of death though [sic] a series of equal periodic payments over 5 years at an interest rate of 0%. **Your portion of this Benefit Base is $833,940.79.** This Benefit Base Amount will be divided over the 5 year period based on a series of equal periodic payments based on a 0% interest rate. If you choose to elect this option all beneficiaries must agree to and elect this option in order to receive this Benefit Base. We were notified that you were no longer married to Charles D. Zyburo at the time of his/her passing. Please provide the Divorce Decree and Property Settlement so that we may determine how to proceed with the processing of this claim.
>
> Since this product offers the Death Benefit Rider that will pay the benefit base if elected, we must receive all requirements from all beneficiaries prior to proceeding with payment.
>
> ….

*Id.* The letter does *not* state that distribution of the Rider's Death Benefit Base must commence within one (1) year of the Owner's passing.

48.    Catherine requested information about her death benefit claim for death and on April 28, 2021, Defendant replied requesting the same information as before. See **Exhibit T**, *April 28, 2021, NAC Letter to Catherine re Claim*.  This letter also omitted information that distribution of the Benefit Base must commence within one (1) year of the Owner's passing.

49.    On May 23, 2021, to comply with Defendant's instructions to Shigley on March 23, 2021, Candice sent a letter to Defendant with a copy of the Divorce Decree and MSA and

advised that the death certificate was not yet available. See **Exhibit U**, *May 23, 2021, Letter from Candice to NAC.*

50.     On May 28, 2021, Defendant sent another letter to Catherine requesting the same information but the death certificate had not yet been issued at that time. **Exhibit V**, *May 28, 2021, NAC Letter to Catherine re Claim.* This letter also omitted information that distribution of the Benefit Base must commence within one (1) year of the Owner's passing.

51.     Candice Zyburo filed an Application for Informal Probate of Will and Appointment of Personal Representative on May 27, 2021, in the Second Judicial District Court under case number D-202-PB-2021-00411. The Court then appointed Candice as Personal Representative of the Estate in an Order of Informal Probate of Will and Appointment of Personal Representative, entered on June 24, 2021.

52.     On June 4, 2021, Defendant sent another letter to Catherine requesting only the death certificate and Claimant Statement. As it had already received the Divorce Decree and MSA. Likewise, his letter did not include information about the distribution of Base Benefits commencing with the year of the Owner's death. See **Exhibit W**, *June 4, 2021, NAC Letter to Catherine.*

53.     The Medical Examiner explained that due to COVID-19, it would take longer than normal for the death certificate to be issued, which it finally was on June 11, 2021, and the Plaintiffs immediately submitted it to Defendant. See **Exhibit X**, *Death Certificate.*

54.     On July 15, 2021, Candice spoke with the Defendant's agent, Joe Crawford, who directed her to send a copy of the Decedent's Will and Annuity Beneficiary Change Request form. Joe also told Candice to inform them of the payment option she was to select. Candice submitted the same with a cover letter and also informed Defendant that she chose the settlement

option to have the Base Benefits disbursed over the 5-year plan. **Exhibit Y**, *July 15, 2021 Letter from Candice to Defendant.*

55.     On July 26, 2021, Catherine completed the Annuity Proof of Death Claimant's Statement form, provided by Defendant, and selected the settlement option to have the Base Benefits paid out over a period of time. On July 28, 2021, Robert Shigley faxed the form to Defendant on behalf of Catherine. **Exhibit Z,** *July 29, 2021, Fax Cover & Catherine's Claim.* Nowhere on Defendant's Annuity Proof of Death Claimant's Statement does it state that distribution of the Death Rider Base Benefits had to begin within a year of the Decedent's death. *See Id.*

56.     On August 4, 2021, Candice called Defendant and spoke to a representative named Dawn, to confirm Defendant's receipt of the paperwork she submitted on July 15, 2021. Dawn advised that she would follow up with Candice in a day or two. But Dawn never called her back.

57.     Candice's correspondence, phone calls, and claim for death benefits continued to be ignored by the Defendant and she was therefore forced to retain counsel to assist her with obtaining her benefits under Decedent's Annuity.

58.     On October 5, 2021, Candice sent a Demand Letter to the Defendant through counsel, requesting information and documentation related to the Annuity. See **Exhibit AA,** *October 5, 2021 Demand Letter.* Enclosed in the letter was the Order Appointing Candice as Personal Representative of the Estate, the Letters Testamentary, the Divorce Petition, Divorce Decree, and MSA, as well as the Decedent's Will.

59.     Notably, both Candice and Catherine submitted their claims for benefits as well as selected their respective Settlement options, within a year of the Decedent's death. However,

60.     Defendant failed to distribute the benefits within a year of the Decedent's death, despite Plaintiff's claims. Defendant also failed to notify the Plaintiffs of any discrepancies or issues with their respective claims within a year of the Decedent's death, despite the Plaintiffs' timely claims. Additionally, Defendant failed to respond to the Plaintiff's requests for information regarding their claims for death benefits, the demand letter sent by legal counsel, within a year of Decedent's death. See **Exhibit BB,** *Affidavit of Candice Zyburo*][See **Exhibit L,** *Affidavit of Catherine Zyburo*].

61.     After multiple inquiries were completely ignored or only partially answered, a Subpoena Duces Tecum was served upon Defendant on June 23, 2022, in probate case number D-202-PB-2021-00411 for all documentation related to the Annuity. See **Exhibit CC,** *Subpoena Duces Tecum.*

62.     The Defendant did not respond to the subpoena until two months later on August 23, 2022.

63.     Upon finally receiving documentation in response to the subpoena and after further communication with Defendant, it was discovered that Defendant never divided the Annuity after the divorce and Defendant expressed uncertainty as to the proper survivor beneficiaries.

64.     Plaintiffs through counsel, continued to diligently and regularly communicate with Defendant. This correspondence was primarily with a Claims Specialist named Joseph Crawford, who was assigned to the matter. Notwithstanding, Defendant refused to articulate the exact reason for its continued restrictions on distribution of benefits to Plaintiffs.

65.     Plaintiffs were essentially obstructed from resolving the issue or discrepancy with their claims for benefits, and distribution continued to be delayed.

66.     Counsel for Plaintiffs demanded Defendant to provide a formal, written position statement to identify with specificity its precise reasoning for placing a hold on distribution to determine if litigation was required. See **Exhibit DD,** *September 7, 2022 Email to Claims Specialist.* On the rare occasions that Defendant chose to respond, it failed to provide any coherent explanation for the hold.

67.     On September 13, 2022, approximately a year and a half after the Decedent passed away, Defendant belatedly provided the Personal Representative with Indemnification Agreements for all conceivable beneficiaries to execute. Defendant still neglected to provide an explanation as to why the Indemnification Agreements were even necessary. See **Exhibit EE**, *September 13, 2022, NAC email with Indemnification Agreements*

68.     Based on the minimal information provided by Defendant for the purpose of the Indemnifications, Plaintiffs were under the sincere belief and understanding that the Indemnifications were specifically related to indemnifying Defendant in the event one of the other heirs made a claim against Defendant for distributing the benefits to Plaintiffs. See **Exhibit L,** *Affidavit of Catherine Zyburo,* and **Exhibit BB,** *Affidavit of Candice Zyburo.*

69.     While coordinating signatures for the Indemnification Agreements, counsel for Plaintiffs contacted Claims Specialist Crawford to confirm several aspects of the Annuity. Specifically, the Plaintiffs requested information regarding the base value of the Annuity, as well as the existence and value of applicable Riders. See **Exhibit FF,** *September 19, 2022 email to NAC.*

70.     Defendant's Claims Specialist responded, stating that, "[t]he death benefit value is $654,921.21. There is no death benefit rider on the contract." See **Exhibit GG,** *September 20, 2022 email from NAC.* The Plaintiffs' Counsel replied, requesting the Claims Specialist to verify

the terms of the Contract and provide documentation proving no Death Benefit Rider. See

**Exhibit HH,** *September 29, 2022 email to NAC.*

71.     On September 30, 2022, the Defendant's Claims Specialist emailed admitting to

making materially inaccurate statements about the Contract and advised that, "[T]his contract

does have a GMDB rider. This rider has a benefit base value of $833,940.79. If the listed

beneficiary(ies) decide to elect the rider payout, they must all agree to choose the rider payout

which must be divided over 5 years." See **Exhibit II,** *September 30, 2022 Email from NAC*

*Claims Specialist.* The Claims Specialist did not state that the distribution must commence

within the year of the Decedent's death, nor did he state that the Plaintiffs did not qualify.

72.     In a separate email exchange, clarification and confirmation were sought as to

how the Death Benefit Rider payout would operate. The Claims Specialist reaffirmed that if the

Plaintiffs "... choose the 5-year payout then the value would be based on the rider value of

$833,940.79. If they choose another settlement option then the value would be based on the base

benefit [sic] value of $654,921.21." See **Exhibit JJ,** *Additional Email Correspondence on*

*September 30, 2022.*

73.     Accordingly, the monetary differences between the death benefit lump sum in the

amount of $654,921.21, and the Death Benefit Rider installment plan is very substantial, it is a

disparity of approximately $179,019.59, not to mention the tax consequences connected to the

lump sum option.

74.     Although the Plaintiffs never thought it was necessary but were anxious to receive

their benefits, they proceeded with executing the Indemnifications and were also able to obtain

signed Indemnification Agreements from two of the three other non-beneficiary heirs, and sent

them to the Defendant immediately. Unfortunately, one of the non-beneficiary heirs, Rene

Zyburo, was hospitalized and incapacitated at the time, and therefore her signature was impossible to obtain.

75.    On February 10, 2023, the Defendant filed an Interpleader Action in the US District Court for the Eastern District of New York (Case No. 1:23-cv-1140). No notice of commencement of the interpleader, nor copies of the filings were provided to Plaintiffs' Counsel.

76.    On February 22, 2023, Rene Zyburo was released from the hospital and executed the Indemnification Agreement which was promptly delivered to Defendant. The Interpleader was voluntarily dismissed shortly thereafter.

77.    With the understanding that issues preventing distribution had been resolved and relying on Defendant's statements about Plaintiff's distribution options, Plaintiffs filled out a Claimant's Statement form on or about March 29, 2023, each selecting the Rider payout option over a period of 5 years.

78.    On April 12, 2023, Plaintiffs each received a letter reflecting a divided account but stating, for the very first time, that the Death Benefit Rider could not be selected because that settlement option was, "... only available for one year from date of death" and went on further to advise that the "Lump sum is the only settlement option available at this time." See **Exhibit KK,** *April 12, 2023 Correspondence from NAC.*

79.    Curiously, the very same letter included the Death Benefit Rider installment option that pays the Benefit Base over the course of 5 years but was devoid of any language stating it had to be distributed within a year of the Owner's death. *Id.* The contradictions in this letter cannot be overstated; on one hand, advising the Benefit Base cannot be paid, while simultaneously providing detailed instructions for making that exact election.

80.     The April 12, 2023 Letter provided no further information or explanation as to why the Death Benefit Rider payout option could not be selected beyond one (1) year from the date of death. Counsel for the Plaintiffs contacted the Defendant multiple times for a formal explanation, only to be given vague references to an undisclosed section of the Internal Revenue Code ("IRC") and that the IRS would not allow for the 5-year payout option. See **Exhibit LL**, *Defendant's Rider Correspondence.*

81.     On or about June 1, 2023, Catherine Zyburo submitted a complaint to the New Mexico Office of Superintendent of Insurance ("OSI"). In its Response dated July 13, 2023, Defendant finally provided a detailed explanation of its position and identified the IRC 72(s) as the reason for the 5-year payout no longer being an available option. See **Exhibit MM,** *NAC Response to OSI Complaint.*

82.     Catherine Zyburo submitted a Reply on or about August 8, 2023, disputing the Defendant's interpretation of and reliance on IRC 72(s). The Reply expressed a litany of frustrations and the efforts made to overcome the unreasonable delays and hurdles imposed by Defendant, not to mention Defendant's lack of notice of any limitations on the Rider distribution period. See **Exhibit NN,** *OSI Reply.* OSI's purview was limited to document review and facilitating dialogue, and therefore closed the file on August 8, 2023, stating that no further action would be taken by their office.

83.     In an effort to avoid costly litigation, Counsel for Plaintiffs sent Defendant a Final Demand Letter on September 5, 2023. This was done as a good-faith attempt to resolve matters prior to commencing litigation. Defendant responded to the Final Demand Letter on September 29, 2023, which simply restated the contents of its OSI Response.

84.    Without the Rider's substantial Benefit Base, the Plaintiffs would suffer a significant loss. The owners and beneficiaries under the Annuity Contract actually made no net benefit from the Annuity investment with Defendant over that five (5) year contract.

85.    The cost to surrender and replace the MassMutual annuity was $14,074.56, plus the premium at Purchase was $600,742.06, plus the cost of the Death Benefit Rider was $39,187.34, totaling $654,003.96.  The Death Benefit value that the Defendant claims the Plaintiffs are entitled to is only $654,921.21, with a $54,179.15 accumulation balance that the Plaintiffs will likely be taxed on anyway. According to Defendant, Plaintiffs are entitled to an aggregate amount less than their original investment which is contrary to the terms, guarantees, and spirit of the Annuity Contract and Death Benefit Rider.

### C. OVERVIEW OF INTERNAL REVENUE CODE § 72(s)

Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

According to the Defendant's letter to the Plaintiffs, dated September 29, 2023, Plaintiff's death benefits claim selection under Annuity Contract and Death Benefit Rider was denied because distribution of the Base Benefit payment would violate IRC § 72(s).

According to 26 U.S. Code Section 72(s) **Required distributions where the holder dies before the entire interest is distributed provide**:

> **(1) In general**
> A contract shall not be treated as an annuity contract for purposes of this title unless it provides that—
> (A) if any holder of such contract dies on or after the annuity starting date and before the entire interest in such contract has been distributed, the remaining portion of such interest will be distributed at least as rapidly as under the method of distributions being used as of the date of his death, and
> (B) if any holder of such contract dies before the annuity starting date, the entire interest in such contract **will be distributed within 5 years after the death of such holder.**

**(2)Exception for certain amounts payable over the life of beneficiary**
If—
(A) any portion of the holder's interest is payable to (or for the benefit of) a designated beneficiary,
(B) such portion will be distributed (in accordance with regulations) over the life of such designated beneficiary **(or over a period not extending beyond the life expectancy of such beneficiary)**, and
**(C) such distributions begin not later than 1 year after the date of the holder's death or such later date** as the Secretary may by regulations prescribe,

then for purposes of paragraph (1), the portion referred to in subparagraph (A) shall be treated as distributed on the day on which such distributions begin.

See 26 U.S.C.S. § 72.

Plaintiffs contend that distribution of the Death Benefit Rider is not in violation of IRC § 72(s) because Plaintiffs did not select payment over the life of the beneficiary and can still be paid to Plaintiffs under the five-year rule. IRC § 72(s)(1)(B). Plaintiffs firmly disagree with Defendant's interpretation and application of IRC § 72(s) regarding the distribution of the Death Benefit Rider payments, however, even if such distribution is violative of IRC § 72(s), the failure to distribute within 1 year of Decedent's death was the result of Defendant's failure to begin timely distribution, not Plaintiffs. Additionally, Defendant failed to provide timely notice or disclosure of the one-year limitation to Plaintiffs. Finally, the Death Benefit Rider is not confined to the one-year limit under the Annuity Contract. Accordingly, the Defendant is therefore liable to the Plaintiffs in an amount to be determined by the Court.

**A. IRC § 72(s) Does Limit Distribution of Rider Benefits to One Year of Death**

Plaintiffs argue that IRC § 72(s)(2) which controls distribution payments within a beneficiary's lifetime but not less than five years, does not govern Plaintiffs' options for distribution of the Death Benefit Rider under the Annuity Contract, nor the timing and distribution of Benefit Base payments pursuant to the Death Benefit Rider. Additionally, IRC §

72(s) does not limit the Death Benefit Rider under the Annuity Contract mandating distribution within the first year of the Decedent's death because the option for Rider payments that the Plaintiffs chose, does not fall within the scope of IRC § 72(s)(2), rather distribution is governed within the scope of IRC § 72(s)(1)(B). Plaintiffs opted for five years of installments of the Rider Benefit payments, therefore installments made within five years of the Decedent's death can still be distributed by Defendant without forfeiting the Rider Death Benefits altogether. The Annuity Contract is devoid of IRC § 72(s)(2) language and therefore the terms governing Rider distribution under the Contract are void. The defective Contract terms, coupled with the Defendant's undue delay and lack of notice, require that the Defendant pay the Rider benefits under IRC § 72(s)(1)(B) and should be liable for damages to Plaintiffs.

Furthermore IRC § 72(s)(2(C) states "such distributions begin not later than 1 year after the date of the holder's death **or such later date as the Secretary may by regulations prescribe.** This language indicates that other provisions in IRC § 72 may apply. Under IRC **§ 72(s)(e)(11) Special rules for certain combination contracts providing long-term care insurance** states in pertinent part in the case of any charge against the cash value "of an annuity contract or the cash surrender value of an life insurance contract made as payment for coverage under a qualified long-term care insurance contract which is part of or a rider on such annuity or life insurance contract— (A) the investment in the contract shall be reduced (but not below zero) by such charge, and(B) such charge shall not be includible in gross income." 26 U.S.C.S. § 72. The "[merger of related life insurers holding annuities arising from structured settlements relating to personal injury liabilities was tax-free IRC § 368(a)(1)(A) reorganization with neither party recognizing gain or loss; also, to extent that IRC § 130 criteria were initially met, affected

contracts' compliance with IRC § 72(s) and (u) was unaffected." Private Letter Ruling

200813027, (2007) 26 U.S.C.S. § 72. *See also* IRC § 72(c), *and* 72(e)(12) Anti-abuse rules.

### B. Defendant's Undue Delay

As demonstrated above Plaintiffs were timely in submitting their benefit claims to

Defendant as well as their settlement options within a year of Decedent's death. Plaintiffs were

also responsive and timely in producing additional information and documentation requested by

Defendant. Moreover, no other person or heir of the Decedent filed a claim for benefits with

Defendant, only Plaintiffs, who proved they were authorized to do so.

Defendant failed to timely notify Plaintiffs of any issue or concerns with their claims or

the paperwork they provided in order for Plaintiff to timely resolve any issues before the first

year of Decedent's death expired. Plaintiffs were in the dark as to any problems with their claims

and were without any recourse or power to have distribution begin when Defendant continued to

ignore their inquiries and requests. Plaintiffs were forced to engage counsel and involve the

judicial system, by issuing a subpoena duces tecum to Defendant, for Defendant to finally

respond and communicate with them even though it is required to do so under the Annuity

Contract and the law. Despite the subpoena which required timely production of the contract and

corresponding documents within 14 days of service, Defendant took two (2) months to respond.

At every turn, Defendant delayed the distribution of benefits to Plaintiffs. By this time, the

1-year limit had come and gone.

### C. Lack of Notice

As demonstrated above, the Plaintiffs were consistent and timely in filing their claims for

benefits, in their communications with Defendant, and in their responsiveness to Defendant's

requests for documents. Once Plaintiffs obtained the death certificate, which was delayed due to

no fault of their own but still timely with regard to IRC § 72(s)(2)(C), Defendant became radio silent. Prior to receiving the death certificate, Defendant maintained fairly considerable written and verbal communications with Plaintiffs, respectively. However, in all of its communications with Plaintiffs, Defendant never once notified them that distribution of the Rider benefit payments must commence within a year of death. Rather, all of their correspondence suggested the opposite, that the 5-year installment plan of Rider payments was one of their options out of only two, the other being a lump sum payment of just the premium base accumulation value. Defendant neither notified Plaintiffs of the issue it had with their claims or paperwork nor did it ever notify them that they could lose the Death Benefit Rider if distribution did not commence within a year of death. Through both their acts and omissions, Defendant misled and misrepresented to Plaintiffs that (1) an issue with their claims for benefits existed, and (2) that the benefits under the Rider were still available to them once their claims were approved. Defendant's failure to timely notify the Plaintiffs of the purported issue with their claims, coupled with failing to notify them of the one-year rule caused Plaintiff substantial damages.

### D. One-Year Limitation on Rider is Not in the Contract

Nowhere in the Annuity Contract does it state that the payment options for the Death Benefit Rider are restricted to distribution commencing within 1 year of death. Rather, this limitation under the expressed terms of the Contract only applies to the death benefits that pay on the accumulated premium value, and only if the beneficiary chooses to be paid during her lifetime, but not to exceed her life expectancy. Moreover, none of the literature produced to Plaintiffs by Defendant throughout the course of the Contract and via the correspondence, and Benefit Annual Statements, was expressly written that distribution of the Rider benefits shall commence within the year of death. The agent, Robert Shigley, did not even advise the Plaintiffs

22

that distributions must commence within a year for the Plaintiffs to receive the Rider benefits. Accordingly, based on the four corners of the Annuity Contract itself, the Rider is not limited to the one-year rule.

The application of IRC § 72 in this case is material to the Plaintiff's foregoing claims against the Defendant. Therefore, the Plaintiffs' analysis and interpretation of IRC § 72 should be incorporated into the arguments in each of the causes of action set forth below.

### D.  CAUSES OF ACTION

### COUNT I: BREACH OF DUTY OF LOYALTY AND DISCLOSURE

#### A.  Breach of Loyalty

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein.

A fiduciary duty existed between Plaintiffs and Defendant on "matters pertaining to the performance of obligations in the insurance contract" as defined by New Mexico law. Defendant, during the adjusting phase of their claim, had a legal duty to cooperate with Plaintiffs, as their insurer. See e.g., *United Nuclear Corp., v. Mission Ins. Co*., 1982-NMCA-023, ¶ 51, 97 N.M. 647, 642 P.2d 1106.

According to the terms of the Annuity Contract, Defendant owed a duty to distribute the death benefits upon notification of the insured passing and the Plaintiff's submission of their claim. By unreasonably delaying and failing to pay the death benefits owed under the policy, the defendant has breached its contractual obligations to the Plaintiffs.

An insurer assumes a fiduciary obligation toward an insured in matters pertaining to the performance of obligations in the insurance contract. *Azar v. Prudential Ins. Co. of Am.*,

2003-NMCA-062, 133 N.M. 669, 68 P.3d 909, *Sanchez v. Allstate Ins. Co.*, 2010 N.M. App.

Unpub. LEXIS 79, 15 (Ct. App. Feb. 3, 2010) (internal citations omitted).

Defendant's breaches of its fiduciary duty of loyalty include but are not limited to, the

following acts and omissions by Defendant in the course of its performance of obligations in the

Annuity Contract:

(i)     Intentionally prolonging the amount of time in which the Annuity generates
        revenue for the defendant through a bad-faith refusal to disclose facts materially
        affecting the Annuity to Catherine Zyburo, Candice Zyburo or the Undersigned;

(ii)    Intentionally failing to timely disclose the defendant's interpretation of IRC 72(s),
        to retain the original owners' $40,000.00 payment for the cost of the allegedly
        now unelectable Death Benefit Rider for no consideration; and

(iii)   Intentionally failing to timely disclose defendant's interpretation of IRC 72(s), to
        retain the $179,000.00 discrepancy between the Benefit Base Amount and Death
        Benefit Rider payout.

In *Chavez v. Chenoweth*, the *New Mexico Court of Appeals* recognized that under certain

circumstances a fiduciary relationship may exist between an insurer and its insured, with this

relationship resulting in "the duty of the insurer to deal in good faith with its insured." 89 N.M.

423, 430, 553 P.2d 703, 710 (1976), the *New Mexico Supreme Court* interpreted Chavez as

holding that the "relationship between insurer and insured imposes a fiduciary obligation on the

insurer to deal with insured in good faith in matters pertaining to the performance of the

insurance contract" (emphasis added)). Thus, the *Chavez Court* concluded that "[a] claim of a

fiduciary relationship fails to state any additional claim upon which relief could be granted,"

beyond breach of the good faith duty. 89 N.M. at 430, 553 P.2d at 710. Here, the defendant's

24

failure to promptly and properly process the plaintiff's claim and pay the death benefits with how they elected it to be paid out constitutes bad faith.

The *Supreme Court of New Mexico* has indicated that "the duty to not act in bad faith or deal unfairly" which an implied covenant of good faith and fair dealing within a contract imposes "becomes part of the contract and the remedy for its breach is on the contract itself." *Bourgeous v. Horizon Healthcare Corp*., 1994-NMSC-038, ¶ 17, 872 P.2d at 857. The defendant's actions were unreasonable, arbitrary, and taken in conscious disregard of the Plaintiffs' rights under the Annuity Contract.

Each and all of the above-stated acts and omissions constitute a breach of the defendant's fiduciary duty to loyalty to Plaintiffs, who reserve the right to plead additional and/or more specific acts and omissions as additional facts become known.

Defendant's breach of its fiduciary duty of loyalty with regard to Plaintiffs caused injury, for which they seek damages within the jurisdictional limits of this Court.

**B. Breach of the Duty of Disclosure**

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein. The plaintiff's reliance on the defendant's misrepresentations and omissions was reasonable and foreseeable.

The defendant's failure to disclose material information constitutes a breach of its contractual and legal obligations to the plaintiffs.

A fiduciary is required to fully disclose material facts and information relating to the fiduciary relationship even if the one to whom the duty is owed has not asked for the information. *Valerio v. San Mateo Enters*., 2017-NMCA-059, 400 P.3d 275.

(i)     Failing to disclose to the original owners of the Annuity, including Catherine Zyburo, that defendant required the Divorce Settlement Form to be executed to divide the Annuity;

(ii)     Failing to disclose to the original owners of the Annuity, including Catherine Zyburo, that defendant had not divided the Annuity, despite Defendant having actual knowledge that the owners were divorced and the Annuity was divided pursuant to the Marital Settlement Agreement;

(iii)     Failing to disclose to the original owners of the Annuity, including Catherine Zyburo, that Defendant rejected the Decedent's Annuity Beneficiary Change Request, in which the Decedent sought to designate Candice Zyburo as the sole primary beneficiary of his portion of the Annuity;

(iv)     Failing to timely disclose basic information and documentation related to the Annuity, despite repeated, unequivocal requests for disclosure from Catherine Zyburo, Candice Zyburo, and the Undersigned;

(v)     Failing to timely disclose the defendant's reason for withholding distribution of proceeds, despite repeated and unequivocal requests for disclosure from Catherine Zyburo, Candice Zyburo, and the Undersigned; and

(vi)     Failing to timely disclose that **26 U.S. Code § 72** (s) allegedly renders Plaintiff's election of the Death Benefit Rider only available to Plaintiffs for one year from Decedent's death.

Moreover, an insurer does not deal fairly with an insured when the "insurer fails to disclose to its insured the existence of an exclusionary provision contained in the insurance contract." *Salas v. Mt. States Mut. Cas. Co.*, 2009-NMSC-005, 145 N.M. 542, 202 P.3d 801.

Meaning, that an insurer has a duty to provide an insured with a "copy of the policy or some type of documentation of its terms." *Salopek Tr. for Salopek Fam. Heritage Tr. v. Zurich Am. Life Ins. Co*., 446 F. Supp. 3d 886, 904 (D.N.M. 2020). Each and all of the above-stated acts and omissions constitute a breach of the defendant's fiduciary duty to disclose to Plaintiffs, who reserve the right to plead additional and/or more specific acts and omissions as additional facts become known.

Defendant's breach of its fiduciary duty to disclose with regard to Plaintiffs caused injury, for which they seek damages within the jurisdictional limits of this Court.

## COUNT II.
## NEGLIGENT MISREPRESENTATION AND FRAUDULENT MISREPRESENTATION

### A. Negligent Misrepresentation

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein.

"[I]n its most general sense, *negligent misrepresentation* arises when the defendant owes a duty of care in communicating information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff." *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 11, 756 A.2d 548 (2000). There are five elements to this claim: (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;(2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Here, the defendant owed a duty of care to the plaintiffs to provide accurate and truthful information concerning the **One-Year Deadline** periodic payments option imposed by North

American insurance policy, which was not clearly and properly defined within the policy. The defendant breached its duty of care by negligently misrepresenting material facts regarding the life insurance policy to the plaintiffs. The plaintiffs suffered damages as a direct result and proximate result of the defendant's negligent misrepresentation.

*Negligent misrepresentation* requires a failure to exercise ordinary care in obtaining or communicating a statement, or an intent that the plaintiff receives and be influenced by the statement where it is reasonably foreseeable that the plaintiff would be harmed if the information conveyed was incorrect or misleading. *Id*.

As described above and as reflected in the referenced exhibits, Defendant knowingly or recklessly made false representations to Plaintiffs regarding Defendant's interpretation of **26 U.S. Code § 72(s)** to induce Plaintiffs to rely on the same. Plaintiffs reserve the right to plead additional and/or more specific acts and omissions as discovery is conducted and additional facts become known.

### B. Fraudulent Misrepresentation

Moreover, a *fraudulent misrepresentation* claim requires that the injured party show that the other party (1) made a misrepresentation of fact; (2) with the intent to deceive and to induce the injured party to act upon it; (3) and upon which the injured party actually and detrimentally relies. *New Mexico courts* have found that when insurance company agents put information in an application "policy" that is inconsistent with the agent's actual knowledge, an insurer has imputed knowledge of that alleged misrepresentation. *Jackson Nat'l Life Ins. Co. v. Receconi*, 1992-NMSC-019, 113 N.M. 403, 827 P.2d 118,127.

As described above and as reflected in the referenced exhibits, Defendant's acts and omissions constitute negligent and fraudulent misrepresentation by Defendant to the Plaintiffs,

who reserve the right to plead additional and/or more specific acts and omissions as additional facts become known.

As a result of the Plaintiffs' reliance on the defendant's negligent and fraudulent misrepresentations, the Plaintiffs have sustained injury, for which they seek damages within the jurisdictional limits of this Court.

### COUNT III:  UNJUST ENRICHMENT

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein.

By denying the Death Benefit Rider payout of the larger amount ($833,940.79) to the Plaintiffs, the defendant had been unjustly enriched at the expense of the Plaintiffs.

The Defendant has received and retained the original premium and Rider costs under the annuity Contract and has failed to provide the promised payout of the Death Benefit Rider. As a result, the Defendant has been unjustly enriched and has received a benefit at the expense of the Plaintiffs without providing corresponding value or benefit in return.

Generally, a party may invoke unjust enrichment as an equitable claim in the absence of a contract. See *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 11; see also *Arena Res., Inc. v. Obo, Inc.*, 2010-NMCA-061, ¶ 14, 148 N.M. 483, 238 P.3d 357 (explaining that unjust enrichment is an "implied obligation[] where, on the basis of justice and equity, the law will impose a contractual relationship between parties, regardless of their assent thereto" (emphasis, internal quotation marks, and citation omitted)). The elements of unjust enrichment are: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust. *Sloane v. Rehoboth McKinley Christian Health Care Servs.*, 2018-NMCA-048, 423 P.3d 18.

As a result of the defendant's bad-faith refusal to timely disclose matters materially affecting the Annuity to Catherine Zyburo, Candice Zyburo, and the Undersigned. Defendant has been unjustly enriched as a result of the aforementioned acts and omissions and at the expense of the Plaintiffs. As a result of the defendant's misrepresentations and refusal to communicate in good faith regarding the Plaintiffs' ability to elect the death benefit rider, the Defendant has knowingly benefitted in ways, including, but not limited, to the following:

(i)     Retaining the original owners' premium, payment for the cost of the terminated Death Benefit Rider with no consideration conferred on the owners or beneficiaries; and

(ii)    Retaining the approximate $179,000.00 discrepancy between the Death Benefit Amount and Rider Benefit Base payout that Plaintiffs are entitled to pursuant to the Annuity Contract; and

(iii)   hidden costs or fees Defendant was not entitled to receive from Plaintiffs' losses under the Annuity Contract.

Each and all of the above-stated acts and omissions constitute unjust enrichment of the Defendant at the expense of the Plaintiffs, who reserves the right to plead additional and/or more specific acts and omissions as additional facts become known.

Defendant has been wrongfully enriched at the expense of Plaintiffs, for which they seek restitution within the jurisdictional limits of this Court.

**COUNT IV:**
**BREACH OF CONTRACT AND BREACH OF THE IMPLIED**
**COVENANT OF GOOD FAITH AND FAIR DEALING**

**A.  Breach of Contract**

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein.

In order to prove a breach of contract, a plaintiff will be required to prove that (1) there is a contractual obligation; (2) there was a breach of such; and (3) the breach resulted in damages. *Alderete v. City of Albuquerque,* 2015 N.M. App. Unpub. (Ct. App. Feb. 23, 2015).

Defendant's breach of the Annuity Contract includes but is not limited to, Defendant's failure to make timely distribution of the benefit options Plaintiffs timely claimed and selected. As well as the Defendant's refusal to allow the Plaintiffs to elect the Death Benefit Rider which Plaintiffs are contractually entitled to as such Rider costs were timely paid to the Defendant in consideration for entitlement to benefits payments under the Rider. The Defendant also breached the terms of the Contract by erroneously applying limitations on the distribution of Rider Death Benefits, which only applied to death benefits under the terms of the contract.

Each and all of the above-stated acts and omissions constitute a breach of contract by Defendant. Plaintiffs reserve the right to plead additional and/or more specific acts and omissions as additional facts become known. As a result of Defendant's breaches of contract, Plaintiffs have sustained injury, for which they seek damages within the jurisdictional limits of this Court.

**B.  Breach of Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein.

The defendant's denial of the Death Benefit Rider constitutes a breach of the implied covenant of good faith and fair dealing inherent in every contract, including insurance contracts.

The defendant's actions were arbitrary, capricious, and undertaken in bad faith, thereby violating its obligation to deal fairly and in good faith with the Plaintiffs.

A Plaintiff may establish bad faith in two ways: (a) by showing that an insurer did not deal fairly with an insured in assessing a policy claim; and/ or (b) by showing that an insured did not act in good faith in the performance of the contract. An insurer does not deal fairly with an insurer when the insurer fails to disclose to its insured the existence of an exclusionary provision contained in the contract. *Id.*

Under New Mexico law, whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement. Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party. A cause of action for breach of an implied covenant of good faith and fair dealing cannot prevail without an accompanying showing for breach of a contract. The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. *Strobel v. Rusch*, No. CIV 1:18-00656-RB-JFR, 2020 U.S. Dist. (D.N.M. Dec. 11, 2020)

Defendant's breaches of the covenant of good faith and fair dealing include, but are not limited to, the following acts of omissions by Defendant in the course of its performance of obligations in the Annuity Contract:

a. Intentionally prolonging the amount of time in which the Annuity generates revenue for Defendant through a bad-faith refusal to disclose facts materially affecting the Annuity to Catherine Zyburo, Candice Zyburo, or the Undersigned;

    b.   Failing to timely disclose Defendant's interpretation of IRC 72(s), in order to retain the original owners' $40,000.00 payment for the cost of the allegedly now unelectable Death Benefit Rider for no consideration; and

    c.   Intentionally failing to timely disclose Defendant's interpretation of IRC 72(s), in order to retain the $179,000.00 discrepancy between the Benefit Base Amount and Death Benefit Rider payout and deprive Plaintiffs of the same.

Each and all of the above-stated acts and omissions by Defendant have deprived Plaintiffs of the benefit of the Annuity Contract. Therefore, each and all constitutes breaches of the implied covenant of good faith and fair dealing as to Plaintiffs, who reserve the right to plead additional and/or more specific acts and omissions as additional facts become known.

Defendant's breach of the implied covenant of good faith and fair dealing with regard to the Plaintiffs caused injury, for which they seek damages within the jurisdictional limits of this Court.

## COUNT V.
## VIOLATION OF THE NEW MEXICO INSURANCE CODE: NMSA § 59A-16-6 AND [UNFAIR INSURANCE PRACTICES ACT]

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein.

The Defendant's actions constitute a violation of **NMSA 59A-16-6**, which prohibits conduct that is willful and in bad faith. The Plaintiffs have suffered damages as a direct and proximate result of the defendant's violation of **NMSA 59A-16-6.**

**Section § 59A-16-6 of the New Mexico Insurance Code "Twisting"** provides that no person shall make or issue, or cause to be made or issued in any manner, any written or oral statement misrepresenting the terms, conditions, benefits, or advantages of any policy for the purpose of inducing or attempting or tending to induce any other person to lapse, forfeit,

surrender, borrow against, retain, exchange, convert or otherwise deal with or dispose of any policy.

Here, the defendant knowingly or recklessly made false representations to the Plaintiffs including but not limited to the distribution of the Death Rider Benefits, the Defendant's interpretation and application of **IRC Section 72(s),** as well as the Defendant's representations regarding timely distribution of benefits and notifications of benefits and/or issues concerning the Annuity Contract and related claims. Therefore, the statute's effect on the terms, conditions, benefits, and/or advantages of the Annuity, induces Plaintiffs to rely on the same, causing Plaintiffs to lapse, forfeit, and surrender their right to elect the Death Benefit Rider. Each and all of the above-stated acts and omissions are fully reincorporated herein and constitute a violation of **NMSA § 59A-16-6** by the defendant on plaintiffs, who reserve the right to plead additional and/or more specific acts and omissions as discovery is conducted and additional facts become known.

As a result of the Plaintiffs' actual and detrimental reliance on the Defendant's false representations, the Plaintiffs have sustained injury, for which they seek damages within the jurisdictional limits of this Court.

### A. Unfair Insurance Practice Act

Both the *New Mexico Unfair Practices Act* (UPA), N.M. Stat. Ann. § 57-12-1 *et seq.* (1967, as amended through 1999), and the *New Mexico Unfair Insurance Practices Act* (UIPA), N.M. Stat. Ann. § 59A-16-1 et seq. (1984, as amended through 1999, prior to 2001 amendment), specifically prohibit the making of any untrue, misleading, or deceptive statements in connection with the sale of any product. N.M. Stat. Ann. § 57-12-2(D) (1967, as amended through 1999); N.M. Stat. Ann. §§ 59A-16-4; 59A-16-5 (1984, as amended through 1999, prior to 2001

amendment). Under the *UIPA*, this includes the failure to disclose material facts reasonably necessary to prevent other statements made from being misleading. N.M. Stat. Ann. § 59A-16-4(G) (1984, as amended through 1999, prior to 2001 amendment). Under the *UPA*, this includes using exaggeration, innuendo, or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive. N.M. Stat. Ann. § 57-12-2(D)(14) (1967, as amended through 1999).

The Defendant's actions deviated from the standards of fairness and transparency required by the Act. The defendant engages in unfair or deceptive practices by denying valid claims without proper investigation of the Plaintiff's policy, delaying payments unreasonably, and misrepresenting policy terms and coverage under the Death Benefit Rider. Such misconduct has harmed the Plaintiff's investment by causing a financial loss from not being allowed to reap their benefit from the contract. Each and all of the above-stated acts and omissions are fully reincorporated herein and constitute violations of the New Mexico Insurance Code and the New Mexico Unfair Insurance Practices Act by the defendant. Plaintiffs reserve the right to plead additional and/or more specific acts and omissions as additional facts become known.

As a result of the defendant's violations of the New Mexico Insurance Code and the New Mexico Unfair Insurance Practices Act, the Plaintiffs have sustained injury, for which they seek damages within the jurisdictional limits of this Court as well as attorney's fees and costs.

### COUNT VI. VIOLATION OF UNFAIR TRADE PRACTICES ACT

Plaintiffs reiterate and incorporate by reference all preceding paragraphs as if fully set forth herein.

The Defendant's actions constitute unfair trade practice in violation of the statute's Unfair Trade Practice Act. The Defendant's conduct was willful, wanton, and undertaken with reckless disregard for the plaintiff's rights under the Unfair Trade Practice Act.

According to the *Unfair Trade Practices Act*, unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful. **NMSA § 57-12-2(D)**. To argue under an unconscionable "Unfair Trade Act" an act or practice in connection with a person's detriment occurs when one: (i) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree or (ii) results in a gross disparity between the value received by a person and the price paid.

The Defendant's violations of the *Unfair Trade Practices Act* include but are not limited to, the following acts of omission by the defendant in the course of its performance of obligations in the Annuity Contract:

a.  Intentionally prolonging the amount of time in which the Annuity generates revenue for the Defendant through a bad-faith refusal to disclose facts materially affecting the Plaintiffs rights to benefits under the Rider Death Benefits pursuant to the Annuity Contract; and

b.  Intentionally failing to timely disclose (i) Defendant's interpretation/application of IRC Section 72(s), in order to retain the Benefit Base Amount under the Rider; and (ii) Death Benefit Rider payout and the the costs associated with the defunct Death Benefit Rider without consideration, resulting in a gross disparity between the value received by Plaintiffs and the price paid.

As demonstrated above in Section C of the Overview of the IRC Section 72(s), the Defendant did not properly interpret and apply the code to the Plaintiffs' settlement option and is not entitled to a defense under the Safe Harbor Act.

Each and all of the above-stated acts and omissions constitute violations of the Unfair Trade Practices Act by the defendant. Plaintiffs reserve the right to plead additional and/or more specific acts and omissions as additional facts become known.

As a result of the defendant's violations of the Unfair Trade Practices Act, the Plaintiffs have sustained injury, for which they seek damages within the jurisdictional limits of this Court as well as attorney's fees and costs.

## E.  REQUEST FOR RELIEF

**1.  CONSTRUCTIVE TRUST:**

A constructive trust is imposed to prevent the unjust enrichment that would result if the person having the property were permitted to retain it. *Tartaglia v. Hodges*, 2000-NMCA-080, 129 N.M. 497, 10 P.3d 176. The circumstances where a court might impose a constructive trust may involve actual or constructive fraud, duress, undue influence, abuse of confidence, breach of a fiduciary duty, or similar wrongful conduct. *Id*. More generally, such a trust can be imposed based upon the breach of any legal or equitable duty, or the commission of a wrong. *Id*.

Here, a constructive trust should be imposed to rectify the unjust enrichment and inequity and protect the rights of the Plaintiffs. Allowing the Defendant to retain their benefit of the bargain would result in an unjust outcome. The Defendant's actions and omission have led to the deprivation of benefits rightfully belonging to the Plaintiffs. Defendant has intentionally prolonged the amount of time in which Annuity generates revenue for Defendant through a bad-faith refusal to disclose facts materially affecting the Annuity to Catherine Zyburo, Candice Zyburo, or the Undersigned. Thus, constructive trust is necessary to remedy the unjust situation and ensure that the Plaintiffs receive the benefits to which they are entitled.

To prevent further unjust enrichment of the Defendant, this Court should impose a constructive trust for the death benefits Plaintiffs are entitled to.  Plaintiffs respectfully request that the Court grant Plaintiffs' request for constructive trust and that the Court grant further relief as is warranted.

### 2.  PUNITIVE DAMAGES:

Punitive damages may be awarded only when the wrongdoer's conduct may be said to be maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the plaintiffs' rights; such damages may be awarded when actual or nominal damages are inadequate to satisfy the wrong committed. *Green Tree Acceptance v. Layton*, 1989-NMSC-006, 108 N.M. 171, 769 P.2d 84, 1989 (N.M. 1989).

In a breach-of-contract case, there must be a showing of bad faith or at least a showing that the breaching party acted with reckless disregard for the interests of the non-breaching party. *See, e.g., United Nuclear Corp. v. Allendale Mut. Ins. Co.,* 103 N.M. 480, 485, 709 P.2d 649, 654 (1985) ("To assess **punitive** damages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim."); *Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co.,* 102 N.M. 28, 30-31, 690 P.2d 1022, 1023-25 (1984).

Here, punitive damages should be imposed because Defendant acted in bad faith. The circumstances surrounding this subject matter involve the Defendant's negligence that led to the liability of the Plaintiffs. The defendant should be found liable for the tort of breaching their covenant of good faith and fair dealing, warranting the imposition of punitive damages. Moreover, the Plaintiffs did not receive proper conduct of due diligence from the Defendant, instead, the Defendant acted with "wanton and wilful misconduct" knowing that the Plaintiffs would rely on them. Defendant did not advise the Plaintiffs about the 1-year deadline as it relates to the Death Benefit Rider, if Defendant had followed their obligation to investigate they would have found that the Plaintiffs selected their method of the payout plan prior to the deadline.

To prevent further future bad faith of the Defendant, this Court should impose punitive damages.  Plaintiffs respectfully request that the Court grant Plaintiffs' request for punitive damages and that the Court grant further relief as is warranted.

### 3. ALTERNATIVELY DEFENDANT SHALL DEPOSIT FUNDS INTO COURT REGISTRY:

Pursuant to Fed. R. Civ. P. Rule 67, Plaintiffs request that Defendant deposit the full amount of the Rider's Benefit Base ($833,940.80) into the Court's Registry pending a trial on the merits.

**WHEREFORE**, Plaintiffs pray for judgment in their favor and against the Defendants and for the following:

a. Special and actual damages as alleged herein and/or proven at trial;

b. Prejudgment interest in the maximum amount allowed by law;

c. Prejudgment interest from the date of the injury through the date of judgment, at the maximum rate allowed by law;

d. Post-judgment interest at the maximum rate allowed by law;

e. As a result of the defendant's malicious, willful, reckless, wanton, oppressive, and/or bad faith actions, punitive damages in an amount to be determined by the Court at trial;

f. Constructive Trust for the death benefit funds Plaintiffs are entitled under the Contract;

g. alternatively, the Defendant should be required to deposit the Rider's Benefit Base ($833,940.80) into the court registry pending trial on the merits;

h. Attorneys fees and costs incurred in the prosecution of this action; and

i. Any and all such other and further relief, whether in law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

DENIRO LAW, LLC

By: /s/ *May Dozier-Reed*
May Dozier-Reed, Esq.
Vanessa L. DeNiro, Esq.
*Attorneys for Plaintiffs*
P.O. Box 45104
Rio Rancho, NM 87174
may@denirolaw.com
vanessa@denirolaw.com
Tele: 505.977.8975

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will serve notice on those parties that are registered users in this matter.

/s/ *May Dozier-Reed*
May Dozier-Reed, Esq.